IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

CYNTHIA S.,[1]

        Plaintiff,

v.

ANDREW M. SAUL,
COMMISSIONER OF SOCIAL SECURITY,

        Defendant.

_____

Civ. No. 6:19-cv-1357-MC

OPINION AND ORDER

MCSHANE, Judge:

    Plaintiff brings this action for judicial review of the Commissioner's decision denying her application for disability insurance benefits. This court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c)(3).

    On December 11, 2015, Plaintiff filed an application for benefits, alleging disability as of July 31, 2004. Tr. 514.[2] Plaintiff had to establish disability as of March 31, 2011, her date last insured. After a hearing, the administrative law judge (ALJ) determined Plaintiff was not disabled under the Social Security Act. Tr. 514-24. Plaintiff argues the ALJ erred in finding her less-than fully credible and in failing to fully develop the record. In the alternative, Plaintiff argues evidence submitted to the Appeals Council undermines the ALJ's determination. Because

---

[1] In the interest of privacy, this opinion uses only the first name and the initial of the last name of the non-governmental party in this case.
[2] "Tr" refers to the Transcript of Social Security Administrative Record provided by the Commissioner.

1 – OPINION AND ORDER

the Commissioner's decision is based on proper legal standards and supported by substantial evidence, the Commissioner's decision is AFFIRMED. The evidence submitted to the Appeals Council does not alter the Court's determination that the ALJ's decision is supported by substantial evidence.

## STANDARD OF REVIEW

The reviewing court shall affirm the Commissioner's decision if the decision is based on proper legal standards and the legal findings are supported by substantial evidence in the record. 42 U.S.C. § 405(g); *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2004). "Substantial evidence is 'more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Hill v. Astrue*, 698 F.3d 1153, 1159 (9th Cir. 2012) (quoting *Sandgathe v. Chater*, 108 F.3d 978, 980 (9th Cir. 1997)). To determine whether substantial evidence exists, we review the administrative record as a whole, weighing both the evidence that supports and that which detracts from the ALJ's conclusion. *Davis v. Heckler*, 868 F.2d 323, 326 (9th Cir. 1989). "If the evidence can reasonably support either affirming or reversing, 'the reviewing court may not substitute its judgment' for that of the Commissioner." *Gutierrez v. Comm'r of Soc. Sec. Admin.*, 740 F.3d 519, 523 (9th Cir. 2014) (quoting *Reddick v. Chater*, 157 F.3d 715, 720-21 (9th Cir. 1996)).

## DISCUSSION

The Social Security Administration utilizes a five-step sequential evaluation to determine whether a claimant is disabled. 20 C.F.R. §§ 404.1520 & 416.920 (2012). The initial burden of proof rests upon the claimant to meet the first four steps. If the claimant satisfies his burden with respect to the first four steps, the burden shifts to the Commissioner for step five. 20 C.F.R. § 404.1520. At step five, the Commissioner must show that the claimant is capable of making an

adjustment to other work after considering the claimant's residual functional capacity (RFC), age, education, and work experience. *Id*. If the Commissioner fails to meet this burden, then the claimant is disabled. 20 C.F.R. §§ 404.1520(a)(4)(v); 416.920(a)(4)(v). If, however, the Commissioner proves that the claimant is able to perform other work existing in significant numbers in the national economy, the claimant is not disabled. *Bustamante v. Massanari*, 262 F.3d 949, 953-54 (9th Cir. 2001).

As Plaintiff applied for disability over a decade after her alleged onset date, and nearly five years after her date last insured, this is not a typical social security case. At the 2018 hearing, Plaintiff testified as to her daily activities nearly 15 years earlier. During the time period at issue, Plaintiff's limitations stemmed largely from her chronic daily headaches. Tr. 543. In a June 2016 function report, Plaintiff stated she could not concentrate or think clearly due to daily migraines.[3] Tr. 713. At the May 2018 hearing, Plaintiff testified that she suffered from constant, debilitating headaches. Tr. 544. The ALJ acknowledged Plaintiff was limited by headaches, but determined Plaintiff was not entirely credible as to her allegations that migraines prevented her from working prior to March 31, 2011, her date last insured. Specifically, the ALJ noted that despite suffering from chronic daily headaches since a 1981 car accident, Plaintiff worked successfully for over two decades. Tr. 520. The ALJ noted Plaintiff stopped working in 2004 not due to a worsening of her symptoms, but because she retired from the Post Office. Tr. 520. The ALJ determined:

> As the claimant has acknowledged, she was able to work full time despite her conditions until 2004. While her injuries, residual symptoms, and the need for surgeries took her off work for some lengthy periods, and while she reported she had difficulty continuing to work because of her symptoms, there is no indication she was unable to perform her assigned work duties. Under the Social Security Administration rules and regulations, the ability to perform work at substantial

---

[3] One month later, in July 2016, Plaintiff stated that beginning on June 30, 2016, she suffered "more frequent migraines which keeps me from participating in normal daily activities." Tr. 744.

>gainful activity levels is the definition of being not disabled. The claimant did not report, and the record does not document, worsening of her conditions as of 2004 or after. She has reported worsening symptoms and limitations in recent years, along with several additional surgeries; however, because the claimant's insured status expired in March 31, 20011, disability must be established by that date. Therefore, consideration of her impairments is limited.

Tr. 520.

These findings are supported by substantial evidence in the record. An ALJ may point to the fact that a claimant quit working for reasons unrelated to her alleged limitations in finding the claimant less-than fully credible as to the extent of her limitations. *Tommasetti v. Astrue*, 533 F.3d 1035, 1040 (9th Cir. 2008); *Bruton v. Massanari*, 268 F.3d 824, 828 (9th Cir. 2001). Here, the ALJ did just that. First, the ALJ noted Plaintiff testified she continued working, despite her alleged limitations, because she needed to maintain her insurance. Tr. 520. Additionally, near her date last insured, Plaintiff worked successfully for several months, eventually quitting not because of her limitations, but because she did not get along with her supervisor. Tr. 520. Given Plaintiff's testimony at the hearing, the ALJ was practically compelled to find Plaintiff's limitations as of the time period in question were not as severe as alleged. At the hearing, Plaintiff stated she suffered from migraines since a 1981 car accident. Tr. 543. The following exchange then took place:

>Q: Okay. A couple issues. First, you started having migraines how long ago, ma'am?
>
>A: It's been over 30 years.
>
>Q: Okay. And you worked with those?
>
>A: Yes, I did.
>
>Q: Okay, so you're telling me now that your migraines are keeping you from working, and yet you worked. Do you understand the disconnect?
>
>A: Well, I continued working, because the gentleman that hit me had no insurance. He came up to after the car accident. I smelled alcohol on him.

4 – OPINION AND ORDER

Q: Okay. And how does that have anything to do with migraines—

A: Well—

Q: —or your ability to work?

A: —the reason—I'll explain to you. He had no insurance.

Q: Okay. I got that.

A: I had to continue working because I had to have my insurance to cover my medical expenses. This man had no insurance to help me with my medical, so I therefore had to continue working, to keep my expenses covered.

Q: Okay. So the traffic accident was when?

A: In 1981.

Q: Okay. And you retired from the postal service in—

A: 2004.

Q: Okay. Over that entire period of time, you were having migraines?

A: Yes, and I have—I continued—I had brain surgeries during all this time, and I had to take time off work during all this time.

Q: And yet still worked?

A: Yes.

Q: You see—do you understand the disconnect between that, okay, that you're saying that you can't work during that period of time and yet you are working during that period of time?

A: I had a hard time.

Q: I don't doubt that at all.

A: I had a really hard time working.

Q: I do not doubt that at all; however, the fact remains—and what I have to do is I have to figure out, okay, you were able to work with migraines all those years. And here's something that I didn't cover in part of the initial discussion that I should have, and I apologize for not getting to that. We have a date last insured issue, which is your insurance for Social Security purposes expires March the 31st of 2011. I'm allowed to consider no evidence after that date, and so I'm kind of restricted in what I can consider and what's in the record that I could actually discuss as part of my Decision. So you got migraines. Okay. So—and let's think

5 – OPINION AND ORDER

back prior to that date of 2011. You have given a statement, saying that you could only lift five pounds currently. Now, what could you do back in 2011?

A: 2011, I was just working. I worked for the hospital for like, four months—

Q: Yes, ma'am.

A: —doing some clerical work, and I quit working there, due to a supervisor that was not really nice to me.

Q: Okay. So it wasn't a medical issue that caused you to quit; it was the—

A: No.

Q: —supervisor was being a bad person?

A: Yes.

Q: I find that entirely credible. They're—you know, many times, supervisors are pretty awful people.

A: Well, she was not very kind to me, so I felt that I didn't deserve the abuse to go to work after working and retiring. And then I went to work just part-time for something to do for the school board in the kitchen, to be around the children, and to be around happy people.

Tr. 544-47.

The ALJ's determination that Plaintiff's work history during the period at issue was inconsistent with her allegations is supported by substantial evidence. That Plaintiff worked two full-time jobs near the time period at issue, and quit both jobs for reasons other than her alleged limitations, is in itself a clear and convincing reason for finding Plaintiff not entirely credible as to her allegation that she was unable to work during the relevant time period. *Tommasetti*, 533 F.3d at 1040; *Bruton*, 268 F.3d at 828.

Additionally, the record supports the ALJ's conclusion that Plaintiff's symptoms were generally longstanding, and only worsened well after her date last insured. Although Plaintiff argues another interpretation of the record is reasonable—i.e., that Plaintiff's migraines worsened after Plaintiff retired in 2004—that is not a legitimate reason for overturning the ALJ's

conclusions. *See Gutierrez*, 740 F.3d at 523 ("If the evidence can reasonably support either affirming or reversing, 'the reviewing court may not substitute its judgment' for that of the Commissioner.") (quoting *Reddick*, 157 F.3d at 720-21)).

In November 2006, Plaintiff presented to the hospital with "complaints of daily headaches combined with nausea and vomiting which got worse after she suffered a bump to her head 2 months ago." Tr. 804. Records from a January 2007 pain center visit indicate Plaintiff "is a 53 y.o. year-old female with a 25 year history of constant, pressure pain located over her entire head. She was involved in a car wreck at that time. Prior to the accident, she had a history of intermittent, chronic migraines." Tr. 799. Plaintiff had a "Long standing history of bilateral, constant headache, status post number of craniotomies for arachnoid cysts removal, skull reconstruction and shunt placements." Tr. 802. "The patient has expressed frustration and **depression** after long standing pain syndrome with no long term relief from any treatment so far." Tr. 802.

The ALJ concluded Plaintiff received some relief from headaches following adjustments to her shunt and compliance with medications prescribed by her physicians. Tr. 521. This too is supported by the record. In March 2007, Plaintiff reported improvement following a November 2006 shunt adjustment. Her doctor noted, "She has done better since then and is only having roughly two headaches a week and just 'toughs them out' without any additional medicine." Tr. 892. "Her headaches are improved since the pressure adjustment on her programmable shunt, by her history." Tr. 893.

One month later, Plaintiff's doctor believed Plaintiff's "chronic daily headaches [were] most likely associated with medication overuse." Tr. 869. One year later, Plaintiff's physician opined, "I suspect, however, reviewing her history, that she has chronic daily headaches

7 – OPINION AND ORDER

associated with medication overuse at this time. . . . Her current neurological examination is normal. She does not have findings of increased intracranial pressure. She does not have postural symptoms suggesting either over shunting or low CSF pressure." Tr. 855.

In January 2009, Dr. Herring noted, "We discussed details of her history, such as review of earlier records indicating a lifelong history of headaches, worse after her accident." Tr. 865. Again, "her accident" occurred nearly 30 years before Dr. Herring wrote the note. Dr. Herring repeatedly counseled Plaintiff on the need to stick with her prescribed medications. In April 2009, Dr. Herring wrote, "This is a complex situation of chronic daily headaches, present for many years, in a patient who tends to overuse analgesic medications in spite of multiple discussions regarding analgesic overuse issues." Tr. 861. One month later, Dr. Herring reported, "She does become emotional when I become very blunt in discussing my concerns around her failure to follow specific medication instructions and her history of doing this in the past, also in discussing previous physicians' documentation of concerns about analgesic rebound headaches." Tr. 857. "Discussed at considerable length my concerns about her not following specific directions and instructions, examples given include her claiming she was taking nortriptyline while not taking this medication, being given a prescription for clonazepam which she did not start, and taking naproxen sodium when she was instructed to discontinue this. I explained my concerns." Tr. 858.

Six months later, Dr. Herring again noted his frustration with Plaintiff's failure to stick to her prescriptions. "The patient does note an increase in headache frequency and this seems to be in the setting of going down on her notriptyline dose. This is a medication change that she did on her own. This precipitated a lengthy discussion once again of the patient making medication changes not as advised by one of her treating physicians. This has been a very longstanding

problem with this patient with a variety of providers. . . . She is specifically advised to make no further changes on her own." Tr. 845. "We did have a lengthy discussion of the patient's tendency to make medication changes, modifying medications on her own. This does not make for an ideal therapeutic alliance." Tr. 846. In January 2010, just over one year before Plaintiff's date last insured, Dr. Herring again commented that "We again reviewed important treatment issues quite extensively, including the importance of medication compliance, the avoidance of triggers, etc. . . . She does have a history of making medication changes on her own and this is again discussed." Tr. 841-42.

Exactly one year before Plaintiff's date last insured, Dr. Herring noted Plaintiff seemed to be improving. "Overall the patient feels significantly better with the combination of her current medications and the adjustments that Dr. Miller made in her shunts. She states that she knows the difference in how her head feels when her shunts need adjustment and she does not feel that this is necessary at this time." Tr. 837. Plaintiff believed her recent headache flares could be related to allergies, although Dr. Herring noted that "in reviewing her diet, she is still consuming known dietary migraine triggers that we have discussed quite extensively in the past."

In November 2010, Dr. Herring noted Plaintiff's headaches were adequately controlled and chiropractic treatments provided relief for Plaintiff's headaches and neck pain. Tr. 822-23. In February 2011, one month before Plaintiff's date last insured, Dr. Herring noted "Overall her headaches are better. The frequency is about three times a month, down from two or three a week. She states that she would like to have a letter from me giving her a medical release to return to work." Tr. 1221. Plaintiff again reported chiropractic treatment helped her headaches. Regarding her headaches, Dr. Herring stated, "At the present time, she is feeling quite well." Tr. 1224. One month after Plaintiff's date last insured, Dr. Herring again noted, "Overall she is

9 – OPINION AND ORDER

feeling that her back and neck pains are in a tolerable range. She has chiropractic therapy once every two weeks, which is helpful. She feels that her current pain is adequately controlled and she is now looking for work. She is not on disability, is retired. She has bad headaches two or three times a month and a dull a.m. headaches about three times a week. Overall things are a whole lot better." "Chronic headache disorder. She is doing well on her current meds." Tr. 1218.

In August 2011, Dr. Herring noted "Overall her headaches are better. She continues to have some degree of headache on a daily basis but states that these are in the 5 on a 1 to 10 scale range and this is a livable level. In fact, she is considering returning to the work force." Tr. 1210. Although Plaintiff still suffered from chronic daily headaches, she felt they "are under adequate control on her current combination of medications." Tr. 1213.

Similarly, in November 2011, Dr. Herring noted Plaintiff "continues to have some degree of headache on a daily basis but her severe headaches are definitely improved, occurring once every two weeks or so. Restless leg symptoms are generally under adequate control. . . . Overall she feels that her current combination of medications is helpful for her headaches and restless legs. . . . She is looking to return to the workforce. She did have an interview just a few weeks ago." Tr. 1205. Plaintiff felt her headaches "are under adequate control with current meds." Tr. 1208.

Nearly one year after Plaintiff's date last insured, Dr. herring noted Plaintiff was "continuing to have daily headaches although improved." Tr. 1200. Plaintiff had been working full-time for over one month and "She is extremely pleased with this change in her life. She notes that there have been some increase in headaches with the stressors of returning to work and her schedule changes. She still gets headaches on a daily basis; with severe headaches about twice a month, for which she takes Dilaudid on an as-needed basis only." "The patient is doing

10 – OPINION AND ORDER

fairly well with her current combination of medications. No change is made. While she still has some degree of headache on a daily basis, these are tolerable." Tr. 1203. As outlined above, Plaintiff quit this job not due to her symptoms, but because she did not get along with a supervisor. Tr. 547. Substantial evidence supports the ALJ's determination that "With consistent medical compliance, treatment notes in 2010 reflect the claimant's symptoms were significantly better, and adequately controlled, with headaches occurring three times per week."[4] Tr. 522.

To summarize, the ALJ did not err in utilizing "ordinary techniques of credibility evaluation" in weighing the validity of Plaintiff's self-reported limitations. *Ghanim*, 763 F.3d at 1163; *Lingenfelter*, 504 F.3d at 1040. Although Plaintiff argues another interpretation of the record is reasonable, that is not a legitimate reason for overturning the ALJ's conclusions. *See Gutierrez*, 740 F.3d at 523 ("If the evidence can reasonably support either affirming or reversing, 'the reviewing court may not substitute its judgment' for that of the Commissioner.") (quoting *Reddick*, 157 F.3d at 720-21)). Because the ALJ provided "specific, clear and convincing reasons" for finding Plaintiff less-than credible regarding the extent of her limitations, the ALJ did not err in giving little weight to Plaintiff's testimony regarding those limitations. *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009) (quoting *Smolen v. Chater*, 80 F.3d 1273,1282 (9th Cir. 1996)).

Plaintiff next argues the ALJ erred in failing to further develop the record. "In Social Security cases, the ALJ has a special duty to develop the record fully and fairly and to ensure that the claimant's interests are considered, even when the claimant is represented by counsel." *Mayes v. Massanari*, 276 F.3d 453, 459 (9th Cir. 2001). At no point during the hearing did Plaintiff or her non-attorney representative indicate there were any outstanding records to be

---

[4] While Plaintiff argues headaches three times each week could well render Plaintiff disabled, substantial evidence, as outlined above, supports the ALJ's conclusion that Plaintiff successfully worked for over two decades despite suffering from chronic, daily headaches.

11 – OPINION AND ORDER

produced. As discussed below, although Plaintiff submitted 500 pages of medical records after the ALJ's decision, none of those records were from the time period at issue. Tr. 18-510. The ALJ had the benefit of voluminous medical records, consisting of over 1000 pages spanning the course of several years. Especially when viewed with Plaintiff's testimony at the hearing—where, as discussed above, Plaintiff clarified that she worked successfully until her 2004 retirement despite suffering daily migraines since at least 1981—the record was adequate for the ALJ to evaluate the evidence and no further development of the record was required. *Mayes*, 276 F.3d at 459-60.

Plaintiff next argues that evidence submitted following the ALJ's decision, but considered by the Appeals Council, necessarily means the ALJ's decision is not supported by substantial evidence. "[W]hen a claimant submits evidence for the first time to the Appeals Council, which considers that evidence in denying review of the ALJ's decision, the new evidence is part of the administrative record, which the district court must consider in determining whether the Commissioner's decision is supported by substantial evidence." *Brewes v. Comm'r of Soc. Sec. Admin.*, 682 F.3d 1157, 1159-60 (9th Cir. 2012). As noted above, none of the new evidence consists of any medical records from the time period at issue.

Plaintiff argues letters from Dr. Herring and Dr. Moore cast doubt on the ALJ's decision. The Court disagrees. Both doctors provided letters dated several years after the period at issue. Dr. Herring offered an opinion from September 2018 that Plaintiff's multiple medical issues meant "that this patient would have been considered disabled between the dates 07/31/04 and 03/31/11." Tr. 387. A physician's opinion that one is "disabled," however, is not a medical opinion but instead an opinion on an issue reserved for the Commissioner. 20 C.F.R. § 404.1527(d).

12 – OPINION AND ORDER

Likewise, Dr. Moore's letter does not undermine the ALJ's decision. Dr. Moore, who first treated Plaintiff in December 2010, noted that Plaintiff's "epidural steroid injections throughout the years provid[ed] her only temporary relief. Tr. 522. The ALJ thoroughly discussed the medical records for the time period at issue. As noted above, the records before the ALJ include Dr. Herring's note from one month after Plaintiff's date last insured that although Plaintiff received a benefit from injections, such benefit was merely temporary in nature. Tr. 1215. Despite that temporary benefit, Dr. Herring noted Plaintiff at that time "feels that her current pain is adequately controlled and she is now looking for work." Tr. 1215. Ultimately, no provider offered any functional limitation for Plaintiff during the time period at issue; i.e., seven years before the doctors provided the letters. Even given the new evidence submitted to the Appeals Council, the ALJ's findings are supported by substantial evidence in the record.

## CONCLUSION

The ALJ's decision is free of legal error and supported by substantial evidence. The Commissioner's final decision is therefore AFFIRMED.

IT IS SO ORDERED.

DATED this 17th day of September, 2020.

                                                         _/s/ Michael J. McShane_
                                                           Michael McShane
                                            United States District Judge